UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
BOWLING GREEN DIVISION
CASE NO. 1:05CV-135-R

SCOTT OWENS, and                                                              PLAINTIFFS
BECKY OWENS

v.

CUMBERLAND MORTGAGE, INC.,                                      DEFENDANTS
THOROUGHBRED, INC., and
COUNTRYWIDE HOME LOANS, INC.


### MEMORANDUM OPINION

This matter is before the Court on Defendant Cumberland Mortgage, Inc.'s (Cumberland)

Motion for Partial Summary Judgment (Docket #27).  Plaintiffs filed a response (Docket #29) to

which Cumberland has replied (Docket #33).   Defendant Countrywide Home Loans, Inc.

(Countrywide) has also filed a Motion for Summary Judgment (Docket #31).  Plaintiffs filed a

response (Docket #34) to which Countrywide has replied (Docket #37).  These matters are now ripe

for adjudication.  For the reasons that follow, Defendant Cumberland's Motion for Partial Summary

Judgment is GRANTED IN PART and DENIED IN PART and Defendant Countrywide's Motion

for Summary Judgment is GRANTED.

### BACKGROUND

The Plaintiffs, Scott and Becky Owens, filed this action on August 4, 2005, in Russell Circuit

Court against Cumberland, Thoroughbred, Inc., and Countrywide.   Defendants subsequently

removed the case to this Court pursuant to 28 U.S.C. §§ 1441, et seq.  This action arises out of the

Plaintiffs' refinancing of the mortgage on their home, which was brokered by Cumberland and

financed by Countrywide. Plaintiffs claim that Cumberland made fraudulent representations to them

in brokering their home loan and that Cumberland's actions also violated the Fair Debt Practices Act. Plaintiffs also asserted claims against Countrywide for fraud and violations of the Fair Debt Practices Act.[1]

Cumberland is in the business of mortgage brokering. Each year, Cumberland pays for and receives a list of homeowners in Cumberland's region from a service called Polk Directory, which contains names, phone numbers, and interest rates paid by each homeowner on their respective home loans. Cumberland has a telemarketing department, headed by Keith Chafin, that utilizes the list of homeowners to contact prospective customers. The telemarketing department attempts to contact any homeowner on the list except for those on the "No telemarket list." If the homeowner indicates that they are interested in refinancing their home loan, Chafin completes Cumberland's Credit Application, containing the homeowner's name, social security number, and information concerning the homeowner's current home loan.

The information compiled by Chafin is then given to Cumberland's General Manager, who follows up with a second phone call to the homeowner to determine if they are interested in meeting with a Cumberland representative to discuss a refinancing of their home loan and to arrange an appointment time. The General Manager completes a Follow Up Work Sheet with the homeowner's name and contact information, directions to their home, and the appointment time. Gary Martin then travels to the homeowner's home to discuss the type of loan the homeowner is interested in and available options. Martin completes a Loan Assessment Sheet at this meeting, containing the loan terms in which the homeowner is interested. Martin also provides the homeowner with a Good Faith

---

[1] Plaintiffs also asserted claims against Thoroughbred, Inc., Cumberland's loan processor. The claims against Thoroughbred, Inc., were dismissed with prejudice by this Court, having been settled.

Estimate, containing the terms of the purported home loan and all costs associated with the refinancing and loan closing.

As soon as the homeowner indicates that they would like to refinance their home loan, Cumberland runs a credit check on that homeowner to determine if they are eligible for a loan and secures an appraisal of the homeowner's home by a certified real property appraiser. Cumberland then makes a Funding Request from the lender, requesting payment of the loan proceeds to the homeowner. Once the Funding Request is submitted and processed by the lender, Cumberland receives a document entitled the Underwriting Decision, which shows whether the lender approved the homeowner's loan, and if so, at what amount. After the lender approves the loan, Cumberland coordinates with the homeowner to arrange a date to close the loan. Cumberland receives a fee from the lender for brokering the loan once the loan is closed.

Plaintiffs state that, about a year before they refinanced, they began receiving phone calls from Cumberland asking if they were interested in refinancing their home loan. Becky Owens maintains that she always told Cumberland representatives that she was not interested, but that one day in October of 2003, Martin spoke to her husband and they became interested. Plaintiffs claim that Martin represented to them that they could refinance their home loan and obtain a fixed interest rate of 4% for a ten-year term. Plaintiffs discussed the loan, then Scott Owens called Martin back to say they were interested in conferring with him about it. Martin came to the Plaintiffs' house to discuss the loan.

Plaintiffs assert that at the initial meeting with Martin, they only discussed the ten-year, 4% fixed-rate loan. Martin obtained information from the Plaintiffs at this meeting so that Cumberland could check their credit. Plaintiffs signed a service agreement, authorizing Cumberland to act as

3

loan broker on their behalf.  Plaintiffs also signed a Good Faith Estimate at this time.  At that time, Martin left his business card with them with the ten-year, 4% fixed rate terms written on it.  At some point subsequent to their initial meeting, Martin called Plaintiffs to inform them that they had been approved for a loan.

Martin next met with Plaintiffs on November 14, 2003, for the loan closing at their home. Becky Owens testified that Martin was late that day, leaving her and her husband only forty minutes to review the documents with Martin after he arrived.  Becky Owens testified that she did not tell Martin that she would rather wait to sign the documents or that Martin told her that the documents had to be signed that day.  She did testify that she told him "this is a lot to read not to have time to read it."  Becky Owens stated that Martin told her that she would be receiving copies to read.

Only the Plaintiffs, Martin, and Becky Owens' sister were present at the closing.  Martin stated that he reviewed the loan documents with Plaintiffs, explained each document to them, and had them execute each document to complete the closing of their home loan.  Becky Owens testified that neither she nor her husband signed the Home Equity Line of Credit Variable Rate Disclosure, although their purported signatures dated November 15, 2003, appear on the document.  Martin testified that both witnesses to the loan documents, Glenna Shields and notary Sherry Martin, were not present at the closing and did not observe the Plaintiffs signing the documents.

At the closing Becky Owens also signed a Department of Housing and Urban Development (HUD) Settlement Statement.  A handwritten notation by Martin reads "4%, 10 [year] repay, 15 [year] draw, [payment] [$]828.00."  Martin asserts that he wrote this to show the Plaintiffs what they would have to pay to be able to repay the loan in ten years.

Becky Owens testified that Martin did not give her a copy of the loan documents at

the time of the closing.  Martin states that he left a blank copy of these documents with the Plaintiffs at the time of the closing.  Becky Owens stated that she called Martin several times after the loan closed in an attempt to get copies of the papers signed at her home.  Finally after calling Thoroughbred, Cumberland's loan processor, she received papers of the loan two to three months after the closing.

After the closing, Plaintiffs' loan was processed and finalized, with Countrywide loaning Plaintiffs approximately $82,800, paying off their previous home loan to Wells Fargo and credit card debt to MBNA.  The loan extended to Plaintiffs contained an initial interest rate of 4%, which is variable, and a term of 300 months.  Plaintiffs assert that they believed they were getting a loan for ten years at a fixed rate of 4% with a payment of $806.  Approximately thirty days after the loan closing, Plaintiffs received a statement from Countrywide, containing a required minimum payment and the terms and balance of their home loan.  Plaintiffs then began making payments on that loan.

## STANDARD

Summary judgment is available under Fed. R. Civ. P. 56(c) if the moving party can establish that the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law."  In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"[N]ot every issue of fact or conflicting inference presents a genuine issue of material fact."  *Street v. J. C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989).  The test is whether the party bearing the burden of proof has presented a jury question as to each element in the case.  *Hartsel v.*

5

*Keys*, 87 F.3d 795, 799 (6th Cir. 1996). The plaintiff must present more than a mere scintilla of evidence in support of his position; the plaintiff must present evidence on which the trier of fact could reasonably find for the plaintiff. *See id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). Mere speculation will not suffice to defeat a motion for summary judgment: "the mere existence of a colorable factual dispute will not defeat a properly supported motion for summary judgment. A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Moinette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1177 (6th Cir. 1996). Finally, while Kentucky state law is applicable to this case pursuant to *Erie Railroad v. Tompkins*, 304 U.S. 64 (1938), a federal court in a diversity action applies the standards of Fed. R. Civ. P. 56, not "Kentucky's summary judgment standard as expressed in *Steelvest, Inc. v. Scansteel Serv. Ctr., Inc.*, 807 S.W.2d 476 (Ky. 1991)." *Gafford v. Gen. Elec. Co.*, 997 F.2d 150, 165 (6th Cir. 1993).

## DISCUSSION

## I.    CUMBERLAND'S MOTION FOR PARTIAL SUMMARY JUDGMENT

To prove a claim of fraud under Kentucky law, the plaintiff must establish six elements by clear and convincing evidence:

> the defendant a) made a material misrepresentation; b) which was false; c) which was known to be false or made recklessly; d) which was made with inducement to be acted upon; e) which plaintiff acted in reliance upon; and f) which caused plaintiff injury.

*Rivermont Inn, Inc. v. Bass Hotels & Resorts, Inc.*, 113 S.W.3d 636, 640 (Ky. Ct. App. 2003) (citing *United Parcel Serv. v. Rickert*, 996 S.W.2d 464, 468 (Ky. 1999)).

"If a party intends to argue that fraud, despite his opportunity to read the contract, is a ground for recision, then he misstates the law." *Cline v. Allis-Chalmers Corp.*, 690 S.W.2d 764, 766

6

(Ky. Ct. App. 1985).  An oral representation, contrary to the actual language of a contract, will not result in a recision of that contract where the plaintiffs had an opportunity to read the contract.  *Id.* at 766-67.  Although the Plaintiffs claim that they were left with only forty minutes to review the loan documents, they do not assert that they were required to sign the documents at that time or that they asked to postpone the closing.  Thus, there is no indication that they did not have the opportunity to read the contract.  The language of the contract stated that the loan had an initial interest rate of 4%, which is variable, and a term of 300 months.  Both Plaintiffs voluntarily signed the contract.  Therefore, the Plaintiffs may not sue for recision of the contract on the basis of fraud, although Martin may have made oral representations contrary to the written language of the contract.

Plaintiffs also assert a damages claim for fraud.  Although a party who fails to read a contract may not sue for recision based on oral representations contrary to the written language, "that party may yet have a cause of action based on fraud and deceit against the person who induced him to sign the contract."  *Hanson v. Am. Nat'l Bank & Trust Co.*, 865 S.W.2d 302, 307 (Ky. 1993).  "[I]n general negligence of one party, such as signing a contract without reading it, bars a suit for fraud against another."  *Cline*, 690 S.W.2d at 767.  A party to a contract must exercise the same care to protect himself as the ordinary prudent man would use in the same or similar cases.  *Id.*  Kentucky courts have recognized that fraud can be of so many forms that a particular definition should not be set, requiring each case to be considered on its own facts.  *Id.*  "Where there is evidence that a party to a contract is induced to signing the contract without reading it, it is a question for the jury to determine whether that party exercised ordinary care under the circumstances in doing so."  *Hanson*, 865 S.W.2d at 307.  Plaintiffs have asserted that Martin showed up at their house with only forty minutes in which to do the closing and that he promised them loan terms that were not contained in

7

the Note which they stated was the basis for them entering into the agreement.  As Plaintiffs have provided evidence that they were induced into signing the contract without reading it, the question of whether Plaintiffs used reasonable care in doing so is one for the jury.  *Id.*

Plaintiff, relying on *Papa John's International v. Dynamic Pizza, Inc.*, asserts that the inclusion of a merger clause in the Note precludes Plaintiffs from claiming that Defendants are liable due to Martin's alleged oral statements.  Page eight of the Note contains a merger and integration clause entitled Complete Understanding of the Parties, which states, "There are no oral agreements concerning this Agreement.  This Agreement will not be amended or modified orally."  In *Papa John's*, the defendants made a counterclaim against Papa John's for fraudulent inducement, specifically, that false oral representations by a representative of Papa John's cause the premature closing of defendant's restaurants.  *Papa John's Int'l, Inc. v. Dynamic Pizza, Inc.*, 317 F. Supp. 2d 740, 744 (W.D. Ky. 2004).  The parties, two corporations, entered into a number of franchise agreements during their transactions, which contained merger and integration clauses that provided that the written agreement contained the entire agreement between the parties and superceded all prior understandings or agreements.  *Id.*  The court held that "if any misrepresentations fraudulently induced Defendants into entering the Development Agreement, i.e., misrepresentation prior to the signing of the agreement, the merger and integration clause prevents this action from being brought."  *Id.* at 745.  In that case the court placed emphasis on the fact that the contract was one made by two sophisticated parties.  *Id.*  This Court finds that the *Papa John's* holding is not applicable in this case as the Court does not find Plaintiffs to be sophisticated parties.  Thus, the merger clause does not preclude the Plaintiffs from asserting their claim of fraud against Cumberland.

Therefore, this Court finds that Plaintiff's claim for fraud is properly presented to a jury. However, this Court finds that recision is not a proper remedy for any claim of fraud that the Plaintiffs may have against Cumberland.

## II.    COUNTRYWIDE'S MOTION FOR SUMMARY JUDGMENT

### A.    Fair Debt Collections Practices Act

The express purpose of the Fair Debt Collection Practices Act (FDCPA), 15 U.S.C. §§ 1692 et seq., is to eliminate abusive debt collection practices by debt collectors.  15 U.S.C. § 1692(e). Countrywide claims that it is entitled to summary judgment on this claim as it is not a debt collector as defined by the FDCPA.

The FDCPA defines a debt collector as "any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another."  15 U.S.C. § 1692a(6).  Expressly excluded from the definition is any person who originates the debt.  15 U.S.C. § 1692a(6)(F)(ii).

The Sixth Circuit has previously recognized that a creditor is not a debt collector for purposes of the FDCPA because the company's principal purpose is not the collection of debt but rather the extension of credit.[2]  *Lewis v. ACB Bus. Servs.*, 135 F.3d 389, 411 (6th Cir. 1998).  As Countrywide  was the debt originator in this case it does not meet the definition of a debt collector.

Even if Countrywide had not originated the debt in question, Plaintiffs would be unable to maintain a cause of action against Countrywide under the FDCPA.  The loan held by Plaintiffs has

---

[2]  An exception to this rule, inapplicable in the instant case, arises where the creditor attempts to collect the debt under an assumed name.  *Lewis*, 135 F.3d at 411.

9

never been in default.  The holder of a debt that was not in default when it was obtained by that person is excluded from the definition of a debt collector.  15 U.S.C. § 1692a(6)(F)(iii).

Therefore, this Court finds that Plaintiff's claim against Countrywide under the FDCPA fails as a matter of law.

**B.     Fraud**

Plaintiffs assert that Countrywide is subject to the same fraud allegations as Cumberland. Plaintiffs state that any actions of Cumberland can be imputed to Countrywide as Countrywide acknowledged that they have a broker agreement with Cumberland.

In *Hollinsworth v. Bell*, plaintiff timbermen entered into a contract with a person named Jessie to purchase timber.  *Id.* at 68.  Jessie informed plaintiffs and others that he was defendant Bell's agent during the negotiation and sale when in fact he was a self-selected intermediary trying to work out a deal between the two parties and make some money for himself.  *Id.*  Jessie misrepresented the boundary of the timber involved so that plaintiffs were caused to buy and pay for about $5000 of timber belonging to other persons.  *Id.*  Plaintiffs filed suit against defendant Bell, contending that Jessie was an agent of the defendant.  *Id.*  The court held that although Bell had benefitted from the transaction, because he was unaware of the wrongful act and there was no agency relationship, Bell could not be held liable for Jessie's fraud.  *Id*. at 69.  Here, there are no allegations that Martin was an agent of Countrywide.  As Countrywide was unaware of any fraud committed by Martin and there was no agency relationship, Countrywide can not be held liable for any fraudulent acts committed by Martin.  *Id.*

Therefore, this Court finds that Plaintiff's claim of fraud against Countrywide fails as a matter of law.

10

**C.      Indispensable Party**

Plaintiffs also assert that Countrywide is an indispensable party and is necessary for the complete resolution of this matter as they are the mortgage holder and Plaintiffs have sued for recision of the mortgage.

Plaintiffs have asserted a claim against Defendants for violation of the FDCPA and request as part of their remedies recision of the contract.  15 U.S.C. § 1692k indicates the possible civil liabilities that could result from a violation of the FDCPA.  Under the FDCPA recovery is limited to actual damages sustained by the violation, any other damages as the court may allow, not to exceed $1000, and costs and reasonable attorney's fees.  15 U.S.C. § 1692k;  *See Murphy v. Equifax Check Servs., Inc.*, 35 F. Supp. 2d 200, 201 (D. Conn. 1999) (finding where credit reporting agency offered to settle plaintiff's claims for $1000 plus all reasonable fees and costs, plaintiff had been offered the maximum amount of damages she was entitled to recover).  This section does not provide for recision of the contract as a form of relief.  Thus, Countrywide is not an indispensable party to Plaintiff's claim for violation of the FDCPA as that statute does not provide any basis for recision of the contract.

"If a party intends to argue that fraud, despite his opportunity to read the contract, is a ground for recision, then he misstates the law."  *Cline*, 690 S.W.2d at 766.  An oral representation, contrary to the actual language of a contract, will not result in a recision of that contract where the plaintiffs had an opportunity to read the contract.  *Id*. at 766-67.  As stated above, there is no evidence that Plaintiffs did not have an opportunity to read the contract; therefore, the Plaintiffs may not sue for recision of the contract on the basis of fraud, although Martin may have made oral representations contrary to the written language of the contract.  Thus, Countrywide is not an indispensable party

11

to Plaintiff's claim of fraud against Cumberland as there is no basis for recision of the contract.

Therefore, this Court finds that any argument that Countrywide is an indispensable party and therefore may not be dismissed from this suit fails as Plaintiffs have failed to state a claim under which they could sue for recision of the contract.

## CONCLUSION

For the foregoing reasons, Defendant Cumberland's Motion for Partial Summary Judgment is GRANTED IN PART and DENIED IN PART and Defendant Countrywide's Motion for Summary Judgment is GRANTED.

An appropriate order shall issue.

12